UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

In Re:

**CHITTUR & ASSOCIATES, PC,**

             Debtor.

------------------------------------------------------------X

**Hearing Date & Time**
**February 13, 2018, 10 a.m.**

**Chapter 11**

Case No.  16-22704 (RDD)

# **REPLY AFFIRMATION OF KRISHNAN CHITTUR, ESQ., IN FURTHER SUPPORT OF DEBTOR'S MOTION FOR VOLUNTARY DISMISSAL**

Dated:        February 6, 2018

Krishnan S. Chittur, Esq., hereby solemnly affirms and states as follows under penalties of perjury:

1. I am the principal of the Debtor, and its only employee left to wrap up its affairs. I file this affirmation in further support of Debtor's motion to dismiss, and in response to the "Objections" filed by the potential judgment-debtors ("PJDs"),[1] dkt. 143, which objections, in a bizarre twist, are adopted by the creditor - Landlords[2], dkt. 147 ("LM").

2. Landlords (and PJDs) question the disbursement of Debtor's September 2017 receipt of $380,937 from PJDs. But as clear from Debtor's operating statements from May 2016 - August 2017 - which were on the Court file but obviously neither Landlords nor PJDs reviewed before rushing in to object - Debtor had unpaid, accrued, post-petition liabilities of $253,917 as of August 31, 2017. No one has ever raised any objection to any entry in any of these operating statements - even as of today. Indisputably, these unpaid liabilities were and are administrative expenses.

3. Debtor's share of that receipt ($230,937) was insufficient even to meet those outstanding liabilities. And of course, Debtor had ongoing working capital needs; monthly expenses were about $50,000. After deduction of all revenues received post-petition, Debtor today has net accrued unpaid postpetition liabilities of $136,303.

---

[1] Northern Leasing Systems, Inc., Lease Finance Group, LLC, Ricardo Brown, Robert Taylor, Joseph I. Sussman, Joseph I. Sussman, P.C., and Jay Cohen.

[2] APF 286 MAD LLC, GAN 286 MADISON LLC, AND 286 Madison Associates, LLC.

4. The other objections are equally baseless, and provide no "cause" for denying Debtor the relief sought: Debtor has never been able to file operating statements timely due to work overload manufactured by PJDs and lack of resources, and Debtor's delay in filing the September 2017 - January 2018 operating statements are consistent with that pattern, and not unusual at all. No one has ever objected to such delay thus far. So also, Landlords' reckless accusation of "contempt" ignores Landlords' own refusal to stipulate to confidentiality of highly confidential information, such as tax returns, which discovery dispute has been the subject of Debtor's motion in this Court since October 2017 - which motion remains unanswered by Landlords as of today.

5. In sum, the record is clear and undisputed that Debtor has no assets, and Debtor's and creditors' best interests lie in dismissal, not in saddling Debtor (and the Court and U.S. Trustee) with more unproductive work. Equally significant, such unproductive work would only tie me up and prevent me from prosecuting counterclaims diligently against PJDs, to the detriment of everyone, including Debtor's estate, and Debtor's clients - and most significantly, to the benefit of PJDs. Accordingly, the objections should be overruled, and the instant motion granted in its entirety: after all, Debtor does not seek a discharge, and does not seek protection of this Court.

PJDs Have No Standing

6.  PJDs are counterclaim-defendants[3] in over 100 cases, and defendants in two class actions,[4] being prosecuted by Debtor on behalf of clients, wherein PJDs face significant exposure.  PJDs' attempt to inject itself into this proceeding with meritless filings is obviously to keep Debtor tied up so that Debtor is handicapped in prosecuting these counterclaims (and the class actions) diligently.  Further, PJDs are primarily responsible for Debtor's inability to survive.  PJDs' interests are hostile to those of the Debtor and/or creditors.  Moreover, PJD is not a creditor, and has suffered no "injury".  Hence, PJDs have no standing to be heard on Debtor's instant motion to dismiss.  As explained below, it is imperative to

---

[3] Debtor's opposition to PJDs' motion for retroactive annulment of the stay, dkt. 146, provides the factual background of these claims, and PDOs' massive fraudulent scam which is the subject of an unprecedented lawsuit by the New York Attorney General and the Deputy Chief Administrative Judge of the NYCCC, *People of the State of New York, by Eric T. Schneiderman, Attorney General of the State of New York; and Fern A. Fisher, Deputy Chief Administrative Judge for New York City Courts and Administrative Authority of the Civil Court of The City of New York, v. Northern Leasing Systems, Inc., et al,* I. No. 450460/2016 (N.Y. Sup. N.Y. Co.) ("NYAG Lawsuit").  The contents of dkt 146 are incorporated herein by reference.

[4] Pludeman v. Northern Leasing Systems, Inc., I. No. 101059/2004 (N.Y. Sup. N.Y. Co), and Aldrich v. Northern Leasing Systems, Inc., I. No. 603803/07 (N.Y. Sup. N.Y. Co.). In Pludeman, the Court has appointed me Class Counsel.  The class claims involve a simple contract claim for overcharges on behalf of a class of 1.2 million, with compensatory damages estimated at $142 million against PJD Northern Leasing.  The Appellate Division has also upheld a claim for punitive damages against PJDs Northern Leasing, Jay Cohen, and others on the fraud and contract claims, *Pludeman v. N. Leasing Sys., Inc.,* 40 A.D.3d 366, 369, 837 N.Y.S.2d 10, 13 (1st Dep't 2007), *aff'd,* 10 N.Y.3d 486 (2008).  Through scorched earth tactics, PJDs have stretched this simple case into a 15 year litigation odyssey, and still counting.  PJDs understandably see me as an existential threat for their scam.

Class certification has been denied in Aldrich.  Debtor has appealed that denial.

3

order this "fox out of the henhouse," *Saad v. Sec. & Exch. Comm'n*, 873 F.3d 297, 312 (D.C. Cir. 2017).

7. The counterclaims being prosecuted by Debtor are substantially similar to those in *Northern Leasing Systems, Inc., v. Kollars*, 61 N.Y.S.3d 191 (N.Y. App. Term 2017), wherein Debtor obtained a $1.125 million jury verdict (reduced by the Court to $200,000), in addition to attorneys' fees and expenses, against PJD Northern Leasing Systems, Inc. PJDs face such exposure in each of these 100 plus cases, and PJDs' potential liability to Debtor and to Debtor's clients could be huge.

8. This is apart from the potential class-wide liability in <u>Pludeman</u> and <u>Aldrich</u>.

9. These cases are the majority of Debtor's active cases. Thus, the bulk of any payments to Debtor and its creditors will have to come from potential recoveries therein from PJDs. In other words, <u>whatever is in the "best interests" of the Debtor and its creditors is, by definition, contrary to the "best interests of PJDs.</u>

10. Further, PJD is not, and has never been a "creditor". Its alleged "interest" is based on a hope (and prayer) that it will prevail in its *Ritchie* sanctions motion,[5] notwithstanding clear-cut evidence of its forgery of the underlying lease. Such highly speculative, inchoate "interest" cannot confer standing; <u>by that logic, every one of the adversaries and their attorneys in every case litigated by Debtor would be entitled to be heard herein.</u> The fact that no statute of limitations exists on sanctions motions only highlights the absurdity of that proposition. That is

---

[5]From the evidentiary hearings on that *Ritchie* sanctions motion, Judge Forrest herself appeared to believe that she misconstrued the evidence in her earlier opinion.

contrary to controlling law, which requires an actual injury for purposes of standing - quite apart from PJDs' hostile interests.

11. Thus, PJDs have no standing on this motion. Their objections, a textbook definition of "self-serving," should be summarily stricken.

<u>PJDs' Taking Advantage of My Medical Challenges And Overloading Debtor, Debtor's Inability to Service Cases Timely</u>

12. As stated earlier, dkt. 138-1, PJDs knew that I faced serious medical challenges and could not attend office full-time. Capitalizing on that misfortune, PJDs overloaded Debtor with scorched earth litigation tactics in almost every case: They activated dormant decade-old cases with oppressive discovery demands seeking all kinds of largely irrelevant information from over a decade that the layperson victims of PJDs' fraud would not be able to recall, and documents that such victims would not have. Often, Debtor would have to hunt out clients who moved in the past decade, explain the sudden activation, and have these clients scurrying for the documents and information. PJDs then indulged in motion practice by the boatload. PJDs aggressively pursued default orders and judgments.

13. For example, <u>forty-nine (49) such motions</u> were calendared for just January 3, 2018, January 31, and February 7, 2018. "Ex.1" Sample copies of first page.[6] That is typical of what Debtor has had to deal with for well over a year.

---

[6]The NYCCC eventually adjourned all the cases calendared for January 31 and February 7, 2018, to later dates. Most cases of January 3, 2018, resulted in default orders or refusal to vacate defaults, and Debtor is struggling to rectify those now.

5

14. Many of PJDs' motions were *prima facie* baseless and should never have been filed. For example, State law mandates denial of discovery motions unaccompanied by an affirmation of good faith attempt at resolution,[7] but PJDs routinely filed such motions - indeed, I just received (Feb. 9, 2018) two more such motions. "Ex. 2," First pages of two motions.

15. So also, PJDs obdurately refused to set aside default orders resulting from isolated inadvertent defaults, compelling Debtor to waste time and resources on a motion to vacate - a motion which would have never been insisted upon by any reasonable attorney true to his oath of office to reduce litigation costs and unnecessary motion practice. *See, e.g.*, "Ex. 3," Order in *Northern Leasing v. Anju Singh,* I. No. 11230/2014, Order entered Feb 2, 2018 (setting aside default order due to Debtor's failure to appear in <u>one</u> "inventory control" calendared by the Court, despite years of active prosecution of the counterclaims); *Northern Leasing Systems, Inc., v. Khanna,* I. No. 1454/14 (Order entered Feb. 2, 2018) (same).

16. Indeed, I received yet another notice today from PJDs Northern Leasing and Sussman rejecting an Answer on behalf of a Debtor client ostensibly because the Answer was late (court records did not reveal any proof of service of the Summons and Complaint at all). "Ex. 4," Email to PJD Sussman.

---

[7]*See, e.g., Siegel v. Glassman,* 2018 WL 444247, at *1 (N.Y. App. Div. Jan. 17, 2018) ("The plaintiff failed to provide an affirmation of a good-faith effort to resolve the purported discovery dispute as required by 22 NYCRR 202.7, necessitating denial of its motion").

17. PJDs routinely manufactured such unwarranted motion practice, which motions Debtor had to respond to; otherwise, under the NYCCC's practice, PJDs' motion would be granted on default, which was what occurred on many occasions. It cannot be reasonably argued that PJDs filed these motions for any purpose other than overloading Debtor and laying the foundation fof discovery sanctions and default orders - and even more motion practice.

18. PJDs' instant filings here are simply more of the same, their intent highlighted by the sheer frivolity of the filings. Thus, they have filed a motion, dkt. 141, seeking retroactive annulment of the statutory stay, ostensibly to "liquidate" their inchoate "claim" exceeding $1.2 million for attorneys' fees and expenses in another Court, so that they could - if (and it's a huge "IF"), as and when they prevail - file a "proof of claim" herein for *pro rata* recovery from Debtor's non-existent assets.[8] They have filed objections to Debtor's now-moot[9] motion to set a

---

[8]PJDs' reply, dkt. 148, to Debtor's objections, dkt. 146, simply ignores the objections to their annulment motion. PJDs do not deny that (a) their motion is utterly futile; (b) they are conducting a personal vendata against Debtor and me; (c) Debtor is the only law firm that has stood up them and relentlessly protected PJDs' out-of-state victims; (d) their true purpose is to intimidate Debtor and me into silence; (e) evidentiary hearings in the sanctions motion established that PJDs themselves had forged the *Ritchie* lease; and/or (f) their primary purpose is to keep Debtor tied up in meritless proceedings like their filings here to stall diligent prosecution of the counterclaims against them. So also, PJDs do not (a) explain why one inadvertent error in *Ritchie*, which error Debtor readily conceded, required sixteen of the highest paid lawyers working for "four years," dkt. 148 at 8, to run up a bill exceeding $1.2 million; (b) explain why PJDs delayed for at least 2 ½ months after knowing of this bankruptcy to bring their annulment motion; and (c) dispute that their accusation of Debtor's "bad faith" is plain absurd. While PJDs also assert that other statements in the *Ritchie* pleading, *i.e.,* that PJDs "knew or should have known" the forgery, were false, it is PJDs' assertion is false: Those statements in the *Ritchie* pleadings were and remain true; in other words, whether or not Ms. Ritchie <u>herself</u> informed PJDs of the forgery, the forgery was apparent on the face of that lease, and PJDs "knew or should have known"

16-22704-rdd    Doc 156    Filed 02/11/18    Entered 02/11/18 15:04:20    Main Document
Pg 9 of 16

        bar date for claims, dkt. 144. And they filed these meritless objections to Debtor's voluntary dismissal motion, dkt. 143, despite having no standing, and having interests impeccably hostile with Debtor's and its creditor's "best interests."

19.    PJDs' *mala fide* intent underlying these filings is manifest: to increase Debtor's litigation expenses, to waste Debtor's attorney time, and to keep Debtor's only employee - me - tied up in responding to these frivolous filings. The conclusion is inescapable that PJDs' meritless filings are solely in furtherance of PJDs' own interests in the 100 plus <u>other</u> litigations. Thus, PJDs' filings herein are "frivolous" within the meaning or Rule 11, and sanctions should be imposed to deter such misconduct and abusing the judicial system.[10]

---

that before they dragged Ms. Ritchie all the way from California to New York to defend PJDs' bogus lawsuit. Interestingly, PJDs' own corporate witness who verified the complaint gave deposition testimony that he would not verify the validity of that forged lease!

      Further, PJDs do not deny - and therefore, concede - that they fail the statutory standard for retroactive annulment or modification of the statutory stay, *i.e.*, PJDs make no "unusual" or "unusually compelling" case  Thus, PJDs' annulment motion, by PJDs' own reply, is manifestly frivolous.

[9] Whether this motion results in a dismissal or conversion, no question exists of a "bar date" to be set by this Court. If dismissed, creditors could pursue their remedies in other courts without involvement of this Court. And if converted into Chapter 7, as PJDs concede, there is neither any need nor any basis "to set a bar date in this case." Dkt. 144 at 1-2¶1. Then why did PJDs file that motion to extend the bar date? PJDs don't explain, but the reason is obvious: multiply proceedings to tie up Debtor's attorneys' time.

[10] Such sanctions would be particularly appropriate against PJDs. PJDs have launched a campaign of *ad hominem* attacks against me, making utterly false, offensive, and scurrilous accusations in vile language in open court alleging that I committed serious crimes violative of federal and state law. Displaying their own awareness of the reckless nature of their accusations, they have refused to waive the litigation immunity for defamation so that they could be held accountable in court.

<u>Debtor's Delay In Filing Operating Statements is Immaterial:  Debtor's Operating Statements Were Consistently Filed Several Months Later Due to Overwhelming Workload and Lack of Resources, with No Objections Raised by Anyone Whatsoever</u>

20. I was working all the time that I could physically do so on PJDs' motions and discovery demands.  In addition, Debtor also had to conduct a jury trial in another case against PJD Northern Leasing in October - November 2017.  That trial lasted three weeks.  I could not conduct that trial myself.  Debtor had to retain trial counsel, but nevertheless, I had to prepare him for trial, go through all the records and files with him, draft, review, and revise all the legal memos, filings such as Proposed Jury Instructions, review the daily trial transcripts, and guide him through trial.

21. Thus, I was scampering all the time to keep up, and had no time to file the operating statements - which required careful review before filing - timely.  They were usually filed several months late.

22. Thus, as the docket sheet readily reveals, the operating statements for June - August, 2016, was filed in October 2016, dkt. 48-50; September 2016, filed in November 2016, dkt. 60; October 2016 to April 2017, filed in May 2017, dkts 94 - 100; and May 2017 to August 2017, filed in September 2017.  Today's filing of the operating statements of September 2017 to Jan 2018 is completely consistent with this pattern:

9

23.

| Month | Filed in | Delay (mths) |
|---|---|---|
| May 2016 | Oct 2016 | 4 |
| Jun | Oct 2016 | 3 |
| Jul | Oct 2016 | 2 |
| Aug | Oct 2016 | 1 |
| Sep | Nov 2016 | 2 |
| Oct | May 2017 | 7 |
| Nov | May 2017 | 6 |
| Dec | May 2017 | 4 |
| Jan 2017 | May 2017 | 3 |
| Feb | May 2017 | 2 |
| Mar | May 2017 | 1 |
| Apr | May 2017 | 0 |
| May | Sep 2017 | 4 |
| Jun | Sep 2017 | 3 |
| Jul | Sep 2017 | 2 |
| Aug | Sep 2017 | 1 |
| Sep | Feb 2018 | 4 |
| Oct | Feb 2018 | 3 |
| Nov | Feb 2018 | 2 |
| Dec | Feb 2018 | 1 |
| Jan 2018 | Feb 2018 | |

24. Neither Landlords nor anyone else ever raised any objection to a single one of these late filings at any time - until now. The 4 month delay for the September 2017 is not unusual at all; as seen above, statements were delayed by as much as seven months with no eyebrows raised.

25. Equally significant, neither Landlords nor anyone else have raised any objection to a single one of these operating statements till today.

10

26. Thus, the delay in filing these operating statements is far from unusual, consistent with past practice. Far from the sinister motives enthusiastically attributed by PJDs and Landlords to Debtor and me, that delay is not probative of anything.

27. In any event, the operating statements for September 2017 to January 2018 are being filed herewith, reflecting all of Debtor's disbursements and liabilities.

<u>Landlords' Reckless Accusation of "Contempt", Concealment of Material Facts</u>

28. Landlords blithely assert that Debtor is in "blatant contempt," dkt. 147 at 3¶5, of this Court's order for a 2004 examination. That is demonstrably false and misleading, as already set forth in earlier filings, dkt. 133.

29. To summarize, (a) by email of June 26, 2017, I pointed out the serious problems created by the overbroad 2004 order[11] which made it physically impossible to comply; in response, the Court directed the parties to "meet and confer"; (b) the parties then resolved the substantive discovery disputes and agreed to combine the corporate and personal 2004 examinations, but after all that (c) Landlords flatly refused to stipulate to a court order of confidentiality of the obviously private documents at issue (tax returns and bank statements). Dkt. 133. Landlords' refusal can only be construed as probative evidence of a clandestine intent to publicize my tax returns and other personal information to embarrass me.

---

[11]Debtor never had adequate opportunity to review Landlords' proposed order, which was signed by the Court.

30. <u>Tellingly, Landlords never responded to that discovery motion till today; what could better prove that Landlords themselves believe that their imputations of "secret assets" and improper transfers are baseless.</u> Further, even now, while making reckless allegation of "contempt," Landlords have not explained their obdurate objection to a court order of confidentiality.

31. Equally significant, at Landlords' insistence, the trustee in my personal bankruptcy reopened the already closed 341 examination for the sole purpose of permitting Landlords to participate therein. That examination took place on October 20, 2017, wehrein Landlords' counsel questioned me. Put bluntly, that was another waste of time since Landlords' counsel largely had me reiterate information already in the record.

32. Both these facts, *i.e.,* Landlords' refusal to stipulate to confidentiality and proceed with the 2004 examination, as well as their perfunctory examination in the 341 meeting specially convened by the Trustee for that purpose, abundantly establish that Landlords themselves do not believe their absurd charges of misconduct.

<u>All Funds Received Were Properly Disbursed</u>

33. The nub of the objection is Debtor's receipt of a total of $380,937 in September 2017, in settlement of *Kollars*.

34. Out of the $380,937,[12] Mr. Kollars' share was $150,000, which amount was duly disbursed to him. Debtor's share was thus $230,937. It merits mention that the

---

[12]This was in full and final settlement of all claims and counterclaims, and included the judgment for $200,000 plus interest, and a partial award of attorneys' fees and expenses incurred, $116,592.09 plus interest, dkt. 146-3.

post-petition work by Debtor in the *Kollars* case was significant, including motion practice in the Appellate Term, First Department, Supreme Court of the State of New York, New York County, briefing and arguing the appeal, and negotiating the settlement and finalizing the payment terms.

35. At the time of receipt of that money, Debtor's accrued, unpaid post-petition liabilities were as follows, "Ex. 5," Operating statements from May 2016 - August 2017[13]

| Month | Income | Expenses |
|---|---|---|
| May 2016 | 0 | 71508.6 |
| June | 2975 | 30074.04 |
| July | 8750 | 36438 |
| Aug | 5333 | 42052 |
| Sep | 17650 | 49298.57 |
| Oct | 10000 | 42834.03 |
| Nov | 4250 | 36440.93 |
| Dec | 0 | 37800.24 |
| Jan 2017 | 0 | 35367.18 |
| Feb | 8000 | 33220.45 |
| Mar | 6750 | 42294.71 |
| April | 0 | 33458.71 |
| May | 15400 | 43285.33 |
| June | 3500 | 31356.78 |
| July 2017 | 15700 | 40510 |
| Aug | 2500 | 46274.02 |
| Total | 51850 | 305767.18 |

36. Thus, the post-petition unpaid liabilities *before* receipt ($305767.18 - $51850 = $253,917.18) exceeded Debtor's share ($230,937) by $22,980.18. I was advised

---

[13]Some of the operating statements reflect only paid, not unpaid liabilities.

that it is appropriate to disburse that as part of Debtor's regular administrative expenses. After payment of accrued, unpaid post-petition liabilities in September 2017, Debtor was <u>still</u> left with unpaid accrued post-petition liabilities of $20,267.80.

37. In addition, Debtor has incurred liabilities since August 31, 2017. "Ex. 6," Operating Statements from September 2017 to January 2018. Despite the termination of support staff, Debtor continues to run in the red.

38. Thus, the total accrued, unpaid liabilities of the Debtor as of January 31, 2018 amount to $136,303 - and still counting.

<u>Conclusion</u>

39. Debtor has no assets, and no viable means of survival. No evidence exists otherwise, and Landlords establish no "cause" for conversion. Thus, granting this motion to dismiss would avoid further waste of time and resources of all concerned, including this Court and the U.S. Trustee. Accordingly, the instant motion should be granted in its entirety.

40. Further, given (a) the self-serving nature of PJDs' filings, (b) PJDs' being responsible in large part for Debtor's inability to survive, (c) PJDs' scurrilous *ad hominem* attacks at Debtor and me, and (d) PJDs multiple meritless filings being for the obvious purpose of keeping me tied up in unproductive work to detract me from prosecuting counterclaims against PJDs, sanctions should be imposed upon PJDs, and Debtor should be awarded its attorneys' fees and expenses incurred in

responding to the three frivolous filings filed by PJDs. That would enable Debtor to at least pay some of its accrued liabilities.[14]

| | |
|---|---|
| Dated:    February 11, 2018 | Sd/- |
| | _____ |
| | Krishnan S. Chittur |

---

[14] Upon grant of this request, Debtor agrees to promptly document the requisite attorneys' fees and expenses.

15